UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Grand Jury B-09-1

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : Criminal No. 3:09CR |
| DOUGLAS PERLITZ | : VIOLATIONS: |
| | 18 U.S.C. § 2423(b) (Travel with Intent to Engage Illicit Sexual Conduct) |
| | 18 U.S.C. § 2423(c) (Engaging in Illicit Sexual Conduct in Foreign Places) |

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

1.     **DOUGLAS PERLITZ**, the defendant herein, is a citizen of the United States and was born on or about June 23, 1970.  Since July 2009, **PERLITZ** has been residing in Colorado.  Prior to that time, he was a resident of Fairfield County, Connecticut.  At all times relevant to this Indictment, **PERLITZ** was the director of a charitable works project located in Cap-Haitien, Haiti.

2.     At all times relevant to this Indictment, D.C., F.J., L.F., L.M., T.V., P.E., A.B., T.V., F.F., and J.M., whose true identities are known to the Grand Jury, were males under 18 years of age (also referred to as "minors") residing in the Republic of Haiti.

**Haiti and Project Pierre Toussaint**

3.     The Republic of Haiti is a Caribbean country which, along with the Dominican Republic, occupies the island of Hispaniola.  Haiti is the poorest country in the Western

Hemisphere. Many children under the age of 18 in Haiti live in poverty, are undernourished, and have limited access to education and housing. Oftentimes, these children live in foster homes where they do domestic work or they live on the street (also referred to as "street children") without family care and protection.

4. In or about 1991, **PERLITZ** traveled to Haiti with others for a volunteer mission. Thereafter, **PERLITZ** claimed that he was inspired to begin a school in Haiti to help the street children.

5. In or about 1997, **PERLITZ** was able to obtain a grant from the Order of Malta, a religious organization, and founded Project Pierre Toussaint ("PPT") which was established as a boys school in Cap-Haitien, Haiti, located on the North Coast of Haiti. Initially, PPT began as an intake center referred to as the 13th Street Intake Program. PPT provided services to children of all ages, most of whom were street children. The youngest children were approximately six years of age. The services provided for the street children included, among other things, meals, sport activity, basic classroom instruction, and access to running water for baths. The staff of the intake center included American volunteers who received a small stipend for their work as well as Haitians who were involved with a variety of day to day operations including, but not limited to, teaching, cooking, and driving. By establishing the PPT, **PERLITZ** had access to the street children.

6. PPT continued to expand, and in or about 1999, a residential facility, Village Pierre Toussaint (referred to as the "Village"), was added. The Village was staffed primarily by Haitians, but **PERLITZ** was directly involved with the Village. In or about 2006, the intake center was relocated to another location which was a home in Cap-Haitien and was referred to as "Carinage."

7. In or about 2007, another facility referred to as the 14th Street facility was established. It was a residential program for high-school age children who the defendant claimed needed extra attention. These children lived in a home where two house parents also lived and cared for them. **PERLITZ** individually chose all of the children who resided at the 14th Street facility. By Haitian standards, the 14th Street facility was a middle to upper-middle class home which provided the children with tutors, special cooking arrangements, high-end electronics, and other amenities.

8. PPT also included a house referred to as "Bel Air" which was the home for the American volunteers and was also **PERLITZ's** primary residence in Haiti. Bel Air was a two-level house that was built on a hill. **PERLITZ** lived on the first floor which had its own access to the outside. Next to **PERLITZ's** bedroom on the lower floor was a small foyer-type room and a bathroom. All of the other American volunteers lived on the second floor of the house.

9. In or about 1999, the Haiti Fund, Inc. (the "Haiti Fund"), which was incorporated as a charitable, religious and educational organization in Connecticut, operated as the fund-raising arm of PPT. It consisted of a Board of Directors whose primary objective was to oversee all fund-raising activities. The Board of Directors also oversaw the general operations of PPT. Board Members of the Haiti Fund were chosen by a religious leader, who had met and befriended **PERLITZ** while **PERLITZ** attended college in Connecticut and who frequently communicated with and visited **PERLITZ** in Haiti.

10. The Haiti Fund raised large sums of money through the efforts of a religious leader who asked parishioners for contributions as well as Board Members who regularly

attended dinners, cocktail parties, and other events to raise funds for PPT.

11. Between 1997 and 2008, the funds that were raised on behalf of PPT were transferred to an account in Haiti which **PERLITZ** controlled. Between 2002 and 2008, the following approximate amounts were transferred from the Haiti Fund to **PERLITZ** in Haiti:

| Year | Approximate Amount in U.S. Dollars |
|---|---|
| 2002 | $ 67,300 |
| 2003 | $117,000 |
| 2004 | $168,000 |
| 2005 | $280,000 |
| 2006 | $346,000 |
| 2007 | $639,500 |
| 2008 | $385,550 |

In addition, significant capital expenses and other expenses were directly paid by the Haiti Fund for PPT.

12. **PERLITZ** befriended and recruited male street children to attend the school at PPT.

13. **PERLITZ** worked primarily at the Village where the children would board, and discouraged the other American volunteers from working there.

14. In order to entice and persuade the children to comply with the sex acts, **PERLITZ** provided the promise of food and shelter and also provided monetary and other benefits, including, but not limited to, U.S. and foreign currency, cell phones, other electronics,

shoes, clothes, and other items.  For example, **PERLITZ**, in exchange for sexual acts, provided: (a) D.C. with money and instructed D.C. that he could remain at PPT even if he failed his classes; (b) F.J. and his family with money and other benefits; (c) L.M. with money after **PERLITZ** engaged in the sex acts with him; (d) T.V. with a walkman, shoes, clothes, money and other items of value; (e) A.B. with money and gifts; and (f) J.M. with money, clothes, and meals.

      15.     As part of his grooming process, **PERLITZ** would take a minor to a restaurant where he would provide the minor with food and alcohol and then encourage the minor to spend the night in his bedroom at Bel Air so that he could sexually abuse him.

      16.     As part of his grooming process, **PERLITZ** also showed one or more minors homosexual pornography or displayed homosexual pornography on his computer.

      17.     When minors stayed with **PERLITZ** at Bel Air, he at times instructed them to sleep in his room where he engaged in sex acts or attempted to engage in sex acts with minors.

      18.     During or after the sex acts with the minors, **PERLITZ** would often tell them not to be ashamed or would admit to them that he was "crazy."

      19.     If minors refused to engage in sex acts, **PERLITZ** would at times withhold benefits or threaten to expel them from the program.  For example, when L.F. refused to engage in any further sex acts, **PERLITZ** withheld benefits from him and in or about 2005, when T.V. refused to engage in sex acts for a period of time, **PERLITZ** withheld any benefits from him.

      20.     **PERLITZ** created a hierarchy among the minors with some being given money, clothing, shoes, electronics, and other items while others were denied basic items such as bed sheets.

21.     Minors who engaged in sex acts with **PERLITZ** understood that they would face little or no punishment for engaging in inappropriate conduct or even abusive behavior toward other children at PPT, while those who refused sex acts with **PERLITZ** understood that they could be treated poorly and even expelled from PPT and forced to return to a life on the street.

22.     At various times, **PERLITZ** yelled at and reprimanded minors who he perceived had become disloyal, and he manipulated minors who he sexually abused to recruit and control other minors who he perceived might betray him.

23.     **PERLITZ** concealed the acts of sexual abuse from the staff at PPT and the Board of Directors of the Haiti Fund.

24.     When questioned about why he permitted minors to sleep in his room, **PERLITZ** would attempt to conceal his sexual abuse of the minors by stating that it was common in Haiti for children and adults to sleep together or he would state that the particular minor was having a lot of difficulty.

25.     **PERLITZ** concealed from the Board of Directors of the Haiti Fund and donors that he would utilize some of the money provided to him for PPT to entice and persuade minors to engage in sex acts with him.

26.     **PERLITZ** took steps to control and manipulate members of influential groups to create a purported sense of legitimacy and credibility to the program, thus enabling him to obtain a grant to establish PPT, and to continue to obtain funding for the program.

27.     **PERLITZ** took steps to control and manipulate the Board of Directors of the Haiti Fund to ensure that he maintained autonomy and control over all of the operations at PPT.

28.     **PERLITZ** took steps to interfere with Board Members who questioned **PERLITZ's** conduct in any manner.

29.     In an effort to control the American volunteers from discovering or questioning his abuse of minors, **PERLITZ** maintained exclusive control over PPT's operations, including the funding, making it difficult for volunteers, staff member, or others to question his actions.

30.     **PERLITZ** utilized the fear of unemployment and the difficult economic situation in Haiti to control and prevent the Haitian staff at PPT from coming forward about the allegations of sexual abuse.

31.     After allegations of long-term sexual abuse by **PERLITZ** surfaced in or about 2007, **PERLITZ** used his relationship with a religious leader and influential Board Members to continue to conceal, and attempt to conceal, illegal sexual conduct by causing others to: (a) manipulate, prevent, and preclude Board Members in the United States from questioning any issues relating to **PERLITZ**; (b) prepare a letter to donors stating that the accusations against **PERLITZ** were groundless; (c) bar investigators hired by the Board of Directors entry into **PERLITZ's** room at Bel Air; (d) fly to Haiti and remove two computers and other items from a safe in **PERLITZ's** room at Bel Air, and return those recovered items to **PERLITZ** in Connecticut; and (e) divert donations intended for the Haiti Fund to a different organization.

## COUNTS ONE THROUGH SEVEN
### Travel with Intent to Engage in Illicit Sexual Conduct
### (18 U.S.C. § 2423(b))

32.     The allegations set forth in paragraphs 1 through 31 of this Indictment are hereby re-alleged and incorporated as though set forth in full herein.

33.     On or about the following dates, the exact dates being unknown to the Grand Jury, in Haiti and elsewhere, **DOUGLAS PERLITZ**, the defendant herein, who is a United States citizen, traveled in foreign commerce from the United States to Haiti for the purpose of engaging in illicit sexual conduct as defined in Title 18, United States Code, Section 2423(f), and attempted so to do, with another person under 18 years of age who is identified below and whose true identity is known to the Grand Jury.

| COUNT | APPROXIMATE DATES OF TRAVEL AND ILLICIT SEXUAL CONDUCT | MINOR VICTIM |
|---|---|---|
| 1 | In or about 2003 | D.C. |
| 2 | From in or about 1998 to 2002 | F.J. |
| 3 | In or about 1998 | L.F. |
| 4 | From in or about 1998 to 2003 | L.M. |
| 5 | From in or about 2001 until April 2003 | T.V. |
| 6 | In or about 2001 | P.E. |
| 7 | From in or about 2000 until in or about 2002 | A.B. |

Each in violation of Title 18, United States Code, Section 2423(b) and (e).

## COUNTS EIGHT THROUGH TEN
### Illicit Sexual Conduct in Foreign Places
### (18 U.S.C. § 2423(c))

34.     The allegations set forth in paragraphs 1 through 31 of this Indictment are hereby re-alleged and incorporated as though set forth in full herein.

35.     On or about the following dates, the exact dates being unknown to the Grand Jury, in Haiti and elsewhere, **DOUGLAS PERLITZ**, the defendant herein, who is a United States citizen, traveled in foreign commerce from the United States to Haiti and engaged in illicit sexual conduct as defined in Title 18, United States Code, Section 2423(f), and attempted so to do, with another person under 18 years of age who is identified below and whose true identity is known to the Grand Jury.

| COUNT | APPROXIMATE DATES OF TRAVEL AND ILLICIT SEXUAL CONDUCT | MINOR VICTIM |
|---|---|---|
| 8 | From in or about May 2003 until in or about 2006 | T.V. |
| 9 | From in or about 2006 to 2007 | F.F. |
| 10 | In or about 2004 to 2008 | J.M. |

Each in violation of Title 18, United States Code, Section 2423(c) and (e)

                                        A TRUE BILL

                                         /S/
                                        FOREPERSON

 /S/
NORA R. DANNEHY
UNITED STATES ATTORNEY

 /S/
ALINA P. REYNOLDS
SUPERVISORY ASSISTANT UNITED STATES ATTORNEY

 /S/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY